UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
(at Bridgeport)

**FILED**
2004 MAR 24 P 12: 00
U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | |
|---|---|
| THE CALF ISLAND COMMUNITY TRUST, INC., and MARLYN TSAI<br><br>v.<br><br>YOUNG MEN'S CHRISTIAN ASSOCIATION OF GREENWICH, a/k/a, YMCA OF GREENWICH, THE TRUST FOR PUBLIC LAND, d/b/a, THE TRUST FOR PUBLIC LAND (INC.) | CIVIL NO. 3-02-CV-462 (AHN) |
| UNITED STATES OF AMERICA<br><br>v.<br><br>28.8 ACRES OF LAND, MORE OR LESS, LOCATED OFF THE COAST OF GREENWICH, SITUATED IN THE COUNTY OF FAIRFIELD, STATE OF CONNECTICUT, YOUNG MEN'S CHRISTIAN ASSOCIATION OF GREENWICH, CONNECTICUT (YMCA), AND UNKNOWN OWNERS, ET AL. | CIVIL NO. 3-03-CV-275 (AHN)<br><br><br><br><br><br>March 23, 2004 |

### DEFENDANT YMCA'S SUPPORTING MEMORANDUM OF LAW

*Subject Pleading:*   The Government's Motion for Partial Summary Judgment on the Pleadings (in the Member Case), dated 2/25/04

---

In connection with the above-referenced 2/25/04 Motion, defendant **Young Men's Christian Association of Greenwich, Connecticut ("YMCA")** hereby files this Supporting Memorandum of Law. More particularly, the YMCA hereby addresses two

*No. 3-02-CV-462 (AHN) (Master Docket)*
*No. 3-03-CV-275 (AHN) (Member Case)*                    •*YMCA's 3/23/04 Supporting*
*(United States District Court, at Bridgeport, CT)*         *Memo of Law*

of the issues which defendants The Calf Island Community Trust, Inc. and Marlyn Tsai (said two defendants are collectively, the "Trust") have raised in their 7/16/03 Answer Objecting to Taking and Objection to Release of Funds to YMCA. (The YMCA notes that the Trust's assertion in its 7/16/03 Answer, at pp. 7, *et seq.*, regarding an alleged breached of the "residential use" restrictive covenant in the 6/21/55 Quitclaim Deed conveying Calves Island to the YMCA, has already been briefed in the YMCA's 2/25/04 Local Rule 7(a)(1) Memorandum of Law, at pp. 3-7, which was filed in the Master Case herein.) More specifically with regard to the two issues that the YMCA is addressing in this Supporting Memorandum:

A.   **_FIRST ISSUE_**: In the context of Calves Island, is the right of condemnation in the Declaration of Taking Act (the "DTA"), 40 U.S.C. §258a (now, §3114), trumped by 10/26/84 P.L. 98-548, which 1984 Act was amended by 10/19/90 P.L. 101-443? (Said 1984 and 1990 statutes are collectively, the "McKinney Refuge Act", and they have been codified at 16 U.S.C. § 668dd-nt; and, a copy of said 1984 and 1990 statutes, along with a copy of the 10/27/95 FWS Guidelines discussed in Section A(4) below, were appended to the 7/16/03 Answer.) In this context, the Trust argues (7/16/03 Answer, at pp. 3-4 and 6) that: (i) in the McKinney Refuge Act, which relates to the acquisition of certain lands by the Interior

-2-

*No. 3-02-CV-462 (AHN) (Master Docket)*
*No. 3-03-CV-275 (AHN) (Member Case)*
*(United States District Court, at Bridgeport, CT)*

•*YMCA's 3/23/04 Supporting Memo of Law*

Secretary to be added to the Fish and Wildlife Service (the "FWS") wildlife refuge that is now known as the Stewart B. McKinney Wildlife Refuge (the "McKinney Refuge"), there is no mention that the lands can be acquired via condemnation; and (ii) thus, the Trust concludes, the Interior Secretary can acquire land for the McKinney Refuge only via the means stated in the McKinney Refuge Act at §203(b) (*entitled*: "Acquisition"), *viz.*, by donation, purchase or exchange, and not by condemnation. In sum, the Trust's position is without merit, as follows:

    1. **The McKinney Refuge Act, at §203(b)**. Because §203 of the McKinney Refuge Act (per the explicit text of §203(a)(1)) applies only to the acquisition of "approximately one hundred and forty-five acres of land and waters" to the McKinney Refuge (and *specifically* only with respect to four parcels: Chimon Island, Milford Point, Falkner's Island and Sheffield Island—as identified in §§201(a)(1)–(4)), it therefore does <u>not</u> apply to the acquisition of any other properties (such as Calves Island).

    2. **The McKinney Refuge Act, at §207(a)**. Pursuant to said §207(a), the Interior Secretary was authorized to add land to the McKinney Refuge as follows: "The Secretary may acquire such *additional* lands [*i.e.*, in addition to the 3 parcels that were specified in new §205, *for example*, Great Meadows Marsh in Stratford, CT] for the [McKinney] refuge as the Secretary considers appropriate, and may adjust the

-3-

*No. 3-02-CV-462 (AHN) (Master Docket)*
*No. 3-03-CV-275 (AHN) (Member Case)*
*(United States District Court, at Bridgeport, CT)*

•*YMCA's 3/23/04 Supporting Memo of Law*

boundaries of the refuge accordingly". (Emphasis supplied). Critical to the first issue herein is the next sentence of §207(a): "Any such acquisition shall be carried out in accordance with all applicable laws <u>and</u> *without regard to* Section 203 of this Act". (Emphasis supplied). In other words, with respect to the acquisition of such "additional" lands (which would include Calves Island), the statute is clear in that the Interior Secretary does not need to limit himself to land acquisition via the three methods specified in §203(b)(1) (<u>viz</u>., by donation, purchase or exchange), but instead the Interior Secretary can also use the DTA (which is one of the "applicable laws" — *See* the discussion in the balance of this Section A of the Memorandum) to acquire such lands.

    3.    **The Propriety and Exclusivity herein of Condemnation via the DTA**.

All condemnations by the Government necessarily are based on the Act of August 1, 1888, 40 U.S.C. §258 (now, §3113) (the "1888 Act"). However, it is a tersely-worded, 11-line statute that simply confirms the seminal right of the sovereign to eminent domain; and, as a result, the 1888 Act is not even mentioned by the Trust. Instead, because the Trust solely focuses on the propriety of the Government's use herein of the DTA, therefore, the YMCA will address said propriety in the balance of this Section A of the Memorandum.

Because §207(a) of the McKinney Refuge Act does not preclude condemnation, and because the DTA is undeniably an often used land acquisition method, thus, one

-4-

*No. 3-02-CV-462 (AHN) (Master Docket)*
*No. 3-03-CV-275 (AHN) (Member Case)*
*(United States District Court, at Bridgeport, CT)*

•*YMCA's 3/23/04 Supporting Memo of Law*

of the "applicable [land acquisition] laws" is the DTA. The issue then is whether there is any aspect of the DTA (or in the detailed condemnation procedures in Rule 71A of the Federal Rules of Civil Procedure, which is the rule that implements the DTA) which limits, or places restrictions upon, the Government's ability to acquire herein additional lands via the DTA for the McKinney Refuge.

The first inquiry therefore is whether there is any ambiguity in the DTA's statutory text. A careful review of the DTA text reveals that there is no ambiguity, nor does the Trust even make such a claim. As a result, the cardinal rule of statutory construction, *viz.*, the plain language rule, which was re-confirmed two months ago in Lamie v. United States Trustee, ___ U.S. ___, 124 S.Ct. 1023, 1030, 157 L.Ed. 2d ___ (2004), is to be applied to the DTA:

> It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms. (Cits. and Internal Quotation Marks omitted).

*Accord*: Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450, 122 S.Ct. 941, 950, 151 L.Ed. 2d 908 (2002). A plain reading of the DTA under this rule shows that the Government's right to condemn pursuant to the DTA (and also in Rule 71A's procedures) is completely unpredicated. More specifically, the DTA's grant of condemnation authority to the Government is not whatsoever, per the unambiguous

*No. 3-02-CV-462 (AHN) (Master Docket)*
*No. 3-03-CV-275 (AHN) (Member Case)*                         •YMCA's 3/23/04 Supporting
*(United States District Court, at Bridgeport, CT)*           *Memo of Law*

language of the statutory text: (i) *preconditioned upon* compliance with any other section of the U.S. Code (or with any Federal Regulation or procedures, such as the FWS 10/27/95 Condemnation Guidelines—*See* Paragraph A(4) below), as would otherwise be required *if* there were such predicatative language in the DTA as: "subject to the provisions of ..."; or (ii) *superseded by* any other section of the U.S. Code, as would otherwise be required *if* there were such DTA language as: "except as provided in section ...".

Moreover, this is not an instance in which there are two potentially conflicting congressional enactments. More specifically, this is not a case in which a Federal agency or department has its own statutory condemnation authority in addition to the standard DTA authority, such as: (i) the Postal Service's special condemnation authority in 39 U.S.C. §401(9); or (ii) the Tennessee Valley Authority's special condemnation authority in 16 U.S.C. §831x. Neither the Interior Secretary nor the FWS has any special statutory condemnation authority (*i.e.,* any non-DTA condemnation authority) to acquire lands for FWS refuges, and the Trust makes no such claim. Rather, the Government's power of condemnation for FWS refuges (including land acquisition for the McKinney Refuge) is not statutorily subject to any condemnation statute other than the DTA (and, except of course for the 1888 Act).

In view of the foregoing condemnation exclusivity of the DTA with respect to FWS refuge land acquisition, the next inquiry is whether the Government has duly

*No. 3-02-CV-462 (AHN) (Master Docket)*
*No. 3-03-CV-275 (AHN) (Member Case)*                    •YMCA's 3/23/04 Supporting
*(United States District Court, at Bridgeport, CT)*          *Memo of Law*

complied herein with the DTA. In this context, the Trust does not assert that the Government has failed to comply with the DTA (or Rule 71A) (except for the Trust's now-former 7/16/03 objection, at pp. 2-3, *et seq.,* that The Calf Island Community Trust, Inc. was not initially made a defendant herein, which objection became moot via the Court's 7/31/03 Order making The Calf Island Community Trust, Inc. a defendant herein). In sum, the DTA is the exclusive condemnation statute with respect to the circumstances herein, and it has been properly complied with herein by the Government.

    4.  **The Confirmation of the Exclusivity herein of the DTA that is made via the FWS's 10/27/95 Guidelines (Re: Condemnation Procedures)**. Finally, the use of the DTA as one of the customary procedures to acquire FWS lands (in addition to acquisition via purchase, *et al.*) is confirmed in the FWS's 10/27/95 Guidelines. In the context of land acquisition for FWS refuges, the DTA is listed in the 10/27/95 FWS Guidelines as the sole authority for such condemnation (other than, of course, the 1888 Act). More particularly: (i) at §6.2(B) — one of the specific "Authorities" for land acquisition that is listed by the FWS is the DTA; (ii) at §§ 6.3 and 6.9 — land acquisition via condemnation is confirmed and, critical to the analysis in this Memorandum, it is distinguished from land acquisition via purchase; and (iii) at §6.1 — the United States' fundamental right of condemnation is confirmed: "The power of eminent domain is an inherent power of the sovereign to appropriate private property for public use in any of its constitutional activities".

*No. 3-02-CV-462 (AHN) (Master Docket)*
*No. 3-03-CV-275 (AHN) (Member Case)*
*(United States District Court, at Bridgeport, CT)*

•*YMCA's 3/23/04 Supporting Memo of Law*

5.  **_Conclusion_**.  In sum, the acquisition of additional land for the McKinney Refuge, other than the seven parcels that were specifically identified in the McKinney Refuge Act at §§201(a)(1)-(4) and §§205(1)-(3), and which additional land would include Calves Island, can be undertaken *either* by: (i) a condemnation proceeding that would be exclusively pursuant to the DTA; or (ii) in the alternative (per McKinney Refuge Act, at §207(a)), any other means authorized by applicable law. Because the acquisition of Calves Island for the FWS has been undertaken via a DTA proceeding, which is the exclusive condemnation statute applicable hereto, and because the DTA has been properly complied with herein by the Government, therefore, the Trust's objections to the utilization herein of the DTA are without merit. In conclusion, the fee simple title to Calves Island without question did properly and absolutely become vested in the United States pursuant to the DTA on 2/13/03 simultaneously with its making the 2/13/03 $6.0M deposit with the Clerk of the Court. *See, e.g.*, United States of America v. 99.66 Acres of Land, 970 F.2d 651, 658 (9th Cir. 1992) ("Upon depositing estimated compensation, the [DTA] authorizes the Government to take *immediate title* to the land", citing the DTA) (Emphasis supplied).

B.  **SECOND ISSUE**:  Must the United States comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and related acts, prior to instituting a condemnation proceeding, *or,* must any compliance with said Acts

-8-

*No. 3-02-CV-462 (AHN) (Master Docket)*
*No. 3-03-CV-275 (AHN) (Member Case)*
*(United States District Court, at Bridgeport, CT)*

• *YMCA's 3/23/04 Supporting Memo of Law*

be done only prior to the undertaking of any major Federal action at the property after it has been acquired? The Trust argues (7/16/03 Answer, at pp. 4-5) that compliance with NEPA and other relevant acts must be done prior to the acquisition of Calves Island. In sum, the Trust's position is without merit, as follows:

1. **Compliance with NEPA is required only before a facility starts its regular operations**. Compliance with NEPA is required: (i) with respect to any "major Federal actions *significantly* affecting the quality of the human environment", NEPA, at 42 U.S.C. §4332(C) (Emphasis supplied); and (ii) more specifically, prior to actually beginning the regular operations of a federal project (unless, for example, the operations, such as the FWS Wildlife Refuge activities at Calves Island, are subject to one or more of the exceptions noted in Paragraphs 2 and 3 below). As stated in Chemical Weapons Working Group Inc. v. United States Dept. of Army, 935 F. Supp. 1206, 1216 (D. Utah 1996), *affd*. 111 F. 3d 1485 (10th Cir. 1997): "The purpose of NEPA is to ensure that the [Federal] agency and the public are aware of the environmental consequences of a project before beginning the project". In said case, the Army had already constructed an incinerator to dispose of chemical warfare agents. The conduct of the Army that was being challenged under NEPA was not the construction of the facility, but instead it was only the commencement of its test operations. 935 F. Supp. at 1216. The District Court held that compliance with NEPA was required, not prior to the facility's construction and not even prior to the one year of its test burns, but only prior to the start of its regular operations. 935 F. Supp. at

*No. 3-02-CV-462 (AHN) (Master Docket)*
*No. 3-03-CV-275 (AHN) (Member Case)*
*(United States District Court, at Bridgeport, CT)*

•*YMCA's 3/23/04 Supporting Memo of Law*

1216-17.

2. **Further, if the operations of a project solely maintain the *status quo*, or if the subject conduct does not alter the physical environment, NEPA is not applicable.** Simply stated: "NEPA procedures do not apply to federal actions that do nothing to alter the natural physical environment". Douglas County v. Babbitt, 48 F. 3d 1495, 1505 (9th Cir. 1995), *cert. den.* 516 U.S. 1042, 116 S. Ct. 698, 133 L. Ed. 2d 655 (1996). Similarly, NEPA compliance is not required if the federal agency's conduct does not alter the *status quo* use of the subject property. *See, e.g.*, National Wildlife Federation v. Espy, 45 F. 3d 1337, 1343 (9th Cir. 1995); Raymond Proffitt Foundation v. U.S. Army Corps of Engineers, 175 F. Supp. 2d 755, 770 and 772 (E.D. Pa. 2001). *See also* The Fund for Animals, Inc. v. Thomas, 127 F.3d 80, 84 (D.C. Cir. 1997) ("Because the new national policy [with regard to game baiting on Federal forest lands] maintained the substantive *status quo*, it cannot be characterized as a 'major Federal action' under NEPA") (Cits. omitted). Critically herein, there is no assertion by the Trust: (i) that the FWS's conduct at Calves Island will alter the natural physical environment; or (ii) that the FWS's conduct at the Island is anything but a mere continuation of the *status quo* open space uses that have occurred over the many years at the Island.

3. **NEPA is not triggered by the mere act of land acquisition.** In sharp contrast to undertaking or proposing to undertake non–*status quo* activities on the land post-acquisition, the mere acquisition of land by the Government (whether it is the

-10-

acquirer of the fee title or is the financier of its acquisition by, for example, a state or municipal agency) does not trigger NEPA. *See, e.g.,* United States v. South Florida Water Man. District, 847 F. Supp. 1567, 1580 n.9 (S.D. Fla. 1992), *affd.* in part and *reversed* in part on other grounds, 28 F. 3d 1563 (11th Cir. 1994), *cert. den.* 514 U.S. 1107, 115 S. Ct. 1956, 131 L. Ed. 2d 848 (1995); City of Oak Creek v. Milwaukee Metro. Sewerage Dist., 576 F. Supp. 482, 490 (E.D. Wis. 1983). As succinctly held in United States v. Metropolitan District Commission, 754 F. Supp. 935, 941 (D. Mass. 1991), in the related context of land acquisition by a sewer authority in order to be able to remedy ongoing violations of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. §§1251, *et seq.*: "Land acquisition alone will cause no harm at all".

Additional support for this conclusion that mere land acquisition does not trigger NEPA is found in the related context of the Migratory Bird Conservation Commission, which was established pursuant to the Migratory Bird Conservation Act (the "MBCA"), 16 U.S.C. §§715, *et seq.,* at 16 U.S.C. §715a. More specifically, in the MBCA's allied statute, the National Wildlife Refuge System Act, 16 U.S.C. §§668dd, *et seq.,* at 16 U.S.C. at §668dd(5), the Interior Secretary is required to receive the approval of said Commission in connection with a FWS refuge, not at the time of the refuge's acquisition (such as the condemnation herein), but only at the time of its transfer or other disposition away from the FWS.

*No. 3-02-CV-462 (AHN) (Master Docket)*
*No. 3-03-CV-275 (AHN) (Member Case)*
*(United States District Court, at Bridgeport, CT)*

•*YMCA's 3/23/04 Supporting*
*Memo of Law*

4. **A similar result accrues with regard to NEPA-related statutes**. For example, there is an "operational similarity" between NEPA and the National Historic Preservation Act (the "NHPA"), 16 U.S.C. §§ 470, *et seq.*, in that "courts generally treat 'major federal actions' under NEPA as closely analogous to 'federal undertakings' under the NHPA". Sac and Fox Nation of Missouri v. Norton, 240 F. 3d 1250, 1263 (10th Cir. 2001) (Cit. omitted). Thus, if NEPA is not implicated by an action of the Government (in Sac and Fox Nation, it was a land acquisition by the Secretary of the Interior in trust for an Indian tribe), then, the NHPA similarly is not implicated. *Ibid.* A second illustration is the Fish and Wildlife Coordination Act (the "FWCA"), 16 U.S.C. §§661, *et seq.* In Raymond Proffitt Foundation, 175 F. Supp. 2d at 770, the District Court held that NEPA incorporates the FWCA, and because "Federal actions that merely maintain the *status quo* do not trigger NEPA's requirements", thus, such maintenance of *status quo* matters similarly would not trigger the FWCA. *Ibid.* In sum, if NEPA is not triggered, then NEPA-related statutes are similarly not triggered.

5. **The 10/27/95 FWS Guidelines in its Manual are subject to the Federal Court decisions**. It is noted that the 10/27/95 FWS Guidelines in its *Manual*, at §6.10(A)(3), do state that a NEPA compliance statement should be part of the FWS "Condemnation Package" that is forwarded to the Department of Justice in connection with the FWS's request for the DOJ's condemnation of a specific parcel of land. However, it is hornbook law that said requirement in an agency manual is, of course, subject to the applicable Federal case law, which in this instance are the decisions

-12-

Case 3:02-cv-00462-AHN   Document 54   Filed 03/24/2004   Page 13 of 14

No. 3-02-CV-462 (AHN) (Master Docket)
No. 3-03-CV-275 (AHN) (Member Case)
(United States District Court, at Bridgeport, CT)

•YMCA's 3/23/04 Supporting
Memo of Law

discussed above in Sections B(1)-(3). Thus, for example, if the post-acquisition activities on a property that is to be acquired by the Government's condemnation for a FWS refuge were not of the type that would be subject to NEPA because the post-acquisition activity on the land is solely the Government's maintenance of the *status quo*, See, e.g., National Wildlife Federation, 45 F.3d at 1343, then, any requirement in the FWS Manual to comply with NEPA prior to condemnation is simply not triggered in such circumstances.

6. **Conclusion**. In sum, there are three separate reasons that the Government's act of acquisition of Calves Island does not implicate NEPA, as follows: (i) mere land acquisition, such as the 2/13/03 DTA condemnation of Calves Island, does not *ipso facto* constitute a "major Federal action" under NEPA, at 42 U.S.C. §4332(C); (ii) the fact herein that the FWS's post-acquisition conduct at Calves Island is merely the maintenance of the *status quo* (and the Trust does not contend otherwise); and (iii) the further fact that the FWS's activities at the Island will not alter the physical environment thereof (and the Trust does not contend otherwise). In conclusion, said reasons, and also the case law in connection with NEPA's related acts (such as the NHPA or the FWCA), confirm that compliance with NEPA or its related acts is not required with respect to the Government's DTA condemnation of the Island, and therefore the Trust's objections with respect thereto are without merit.

**WHEREFORE**, the YMCA respectfully requests that the Court grant the Government's 2/25/04 Motion.

*No. 3-02-CV-462 (AHN) (Master Docket)*
*No. 3-03-CV-275 (AHN) (Member Case)*
*(United States District Court, at Bridgeport, CT)*

•*YMCA's 3/23/04 Supporting Memo of Law*

•Dated March 23, 2004 at Greenwich, CT.

**DEFENDANT**
Young Men's Christian Association
of Greenwich, Connecticut (YMCA), *a/k/a*

By: *[signature]*
Philip H. Bartels

For: HOLLAND, KAUFMANN & BARTELS, LLC
Its Attorneys
289 Greenwich Avenue
Greenwich, CT 06830-6595
(203) 869-5600 * (Fax) 869-4648
(Federal Bar No. ct06836)

## CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing shall be mailed this day, postage prepaid, to all formal and informal Counsel of Record on March 23, 2004:

John Hughes, Esq.
Civil Chief
United States Attorneys' Office
Box 1824
New Haven, CT 06508

Joy Ryan, Esq.
United States Department of Justice
Environment and Natural Resources Division
Land Acquisition Section
P.O. Box 561
Ben Franklin Station
Washington, DC 20044

Dorothy Nelson Stookey, Esq.
New England Regional Counsel
The Trust for Public Land (Inc.)
33 Union Street
Boston, MA 02108

John Van Allen Murray, Esq.
Diserio Martin O'Connor & Castiglioni, LLP
One Atlantic Street
Stamford, CT 06901

Mary E. Sommer, Esq.
Sandak, Hennessy & Greco, LLC
970 Summer Street
Stamford, CT 06905

*[signature]*
Philip H. Bartels

U:\PHB\PROPERTY\YMCA\Memorandum of Law