Regional Counsel for TPL, states that the Agreement "as amended on 3/12/02" is located at TPL's New England Regional Office and at the office of the YMCA's counsel. The place for such a critical document is as an exhibit in the within proceeding, and Plaintiff's burden in this respect is not satisfied by referring the Court and other parties to the files of Defendant YMCA and TPL.

To be sure, Defendants Trust and Tsai do not doubt that there is a 3/12/02 amendment – there would **have** to be such an amendment – since the document would support the likelihood that (i) the above-referenced options were <u>not</u> timely exercised, and (ii) the above-referenced "additional option consideration" was <u>not</u> paid.

Given the opportunity for discovery, said Defendants also verily believe that they will be able to readily demonstrate that the Agreement for the Purchase of Lands was never executed or timely extended, requiring its own convoluted mish-mash of make-up amendments and phases of amendments, so as, to the extent possible, not revealing to innocent third parties, <u>by that time well-entangled in the mess</u>, the weight, height, or depth of the apparent "machinations" of Defendants YMCA and TPL.

The result is the August 22, 2002 <u>Memorandum of Assignment and Second Amendment</u> entered into between Defendants YMCA and TPL and later also executed by Mr. French, Realty Officer of the U.S. Fish and Wildlife Service. The Memorandum (annexed hereto as <u>Exhibit 6</u>) apparently was intended to fill-in the gaps, close-up the holes, and otherwise sanitize the overall arrangement. The motivation for U.S. Fish & Wildlife was a reduction in price from the $6,480,000 "appraised value" to $6,000,000 which "shall constitute a donation" by TPL to the United States of America. The agreement sets the stage for the condemnation proceedings, well underway at this point, behind the scenes: e.g.

11

"5. It is understood and agreed that if the Secretary of the Interior determines that the title to said lands or any part thereof should be acquired by the United States of America by judicial proceedings, either to procure a safe title or, when it is in the public interest, to take immediate possession, or for any other reason, then the compensation to be claimed by the Optionor <u>and the award to be made for said lands in said proceedings shall be on the basis of the six million ($6,000,000) dollar purchase price herein provided.</u>" (emphasis supplied)

Par.# 6 of the August 22, 2002 Memorandum deletes the attorneys fees clause (#16) of the Bargain Sale Option Agreement and provides the vehicle whereby TPL can, in the end, benefit from the transaction as broker (by deleting par. # 17 ["No Broker's Commission"] in the original Agreement).

## Significance and relevance of the allegations of Defendants Trust and Tsai

It is readily conceded by The Calf Island Community Trust and Marlyn Tsai that (i) their views or opinions on the amount of the estimated 'just compensation' of $6,000,000, or (ii) their belief that federal funds were procured by Defendants YMCA and TPL under false pretenses, or (iii) that said amount is <u>millions of dollars more</u> than Plaintiff United States had to pay to acquire the subject premises either by purchase or by "taking", are wholly <u>irrelevant</u>.

What <u>is</u> relevant and dispositive, we submit, is the <u>fact</u> that (i) it was the Defendants YMCA and TPL who constructed and proffered this convoluted and flawed framework for determination of the value and price of, or "just compensation" for, the subject Island; (ii) this framework was specifically (if unwittingly) proffered by Plaintiff United States in the Condemnation Complaint (par.10) as the basis for fixing the amount of just compensation; and (iii) was the basis of procurement of federal appropriations by well-meaning Connecticut Congressional representatives.

Rather than rely on proper independent appraisals, to determine the fair market value of the Island (with its severe limitations on development), Defendants YMCA and TPL chose

12

instead to construct their insider, fix-the-price, "Bargain Sale Option Agreement", with its costly consideration of $105,000 (if actually ever paid) which by itself would have influenced independent third parties, including the United States Fish & Wildlife Service, that the parties to the Agreement had knowledge of its value and, in TPL's case, were lending both its national credibility and its own financial commitment to the price/value determination contained therein.

But what is inescapable, and readily demonstrable, is that whatever appraisals were or were not secured, Defendant <u>YMCA had the subject premises on the market for an extended period</u> prior to conceptualizing the Bargain Sale Option Agreement, and, on information and belief,<u> did not receive a single *bona fida* offer</u> for any amount whatever, let alone for the figure of $6,000,000 – or anything approaching it.

The only conclusion to be drawn from the foregoing is that Plaintiff United States, by its Department of the Interior/Fish & Wildlife Service, elected officials who fought for the federal appropriations, and the citizenry of the United States whose money paid the estimated 'just compensation' for the acquisition, were at least misled – and at worst duped -- by Defendants YMCA and TPL into paying $6,000,000 for property that might well have been purchased for $1,000,000 which amount, on information and belief, would have been $1,000,000 <u>more</u> than Defendant YMCA was offered for the Island for an extended period of time when the property was for sale.

### Overall Condemnation Proceeding has been tainted by these events

Regrettably, the above-described events, if demonstrated to be true, would cause enormous and undeserved embarrassment to the United States, to the Secretary of the Department of Interior, to the U.S. Fish & Wildlife Service, to the Office of the United States

13

Attorney, to well-meaning elected officials who advocated the Government's acquisition and arranged for the funding of same -- all of whom Defendants Trust and Tsai verily believe acted in good faith and in reliance upon the representations of Defendants YMCA and TPL.

Defendants Trust and Tsai therefore believe that there was, throughout the past two years, a desire on the part of all innocent parties who would stand to be, at best, embarrassed by the above-described transactions, should they become publicly known and should the allegations herein prove to be true, a desire to aggressively push the scheme forward, cut corners as may be necessary, and get the deal over with as quickly as possible.

In the face of this aggressive rush to judgment by persons and parties who would like to sweep the messy details under the rug, Plaintiff Calf Island Community Trust has correctly been perceived as David up against Goliath, without the resources or staying power of the Government, which government has, at all times, been surrounded and reinforced by the well-funded (including out of the released $6-million public funds) defense of attorneys for Defendant YMCA.

In this context, it has perhaps occurred to this Honorable Court that Defendant YMCA's submission of a lengthy argumentation in support of the Plaintiff amounts to 'protesting just a little too much'. <u>The question the Court is respectfully asked to address is the extent to which the entire condemnation proceeding has been tainted by the actions alleged and complained of herein, and which Plaintiff and Defendant YMCA have thus far carefully side-stepped.</u> The answer is disheartening.

14

## II. ARGUMENT

### A. On the within Rule 12c motion, all inferences to be drawn from the incomplete documentation relied on by Plaintiff must be drawn in favor of the non-moving parties, Defendants Trust and Tsai.

Plaintiff is in agreement with this basic rule of evidentiary evaluation, and itself relies on the settled statement of the proposition in the *Second Circuit, Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001).

Under this principle, for example, Plaintiff's failure to demonstrate, with documents presumably in its possession, that preconditions to the validity of an agreement on which it relies have occurred (e.g. the two $50,000 payments for the extensions of the option), gives rise to an inference that such have <u>not</u> occurred.

Similarly, Plaintiff's failure to produce a document in the established chain of the documentation relied on (e.g. the purported 3/12/02 amendment of the Bargain Sale Option Agreement) gives rise to an inference in Defendants' favor and a presumption that such document, if produced, would not be favorable to Plaintiff, and, at the least, raises a material issue of fact which precludes granting Plaintiff's motion for partial judgment on the pleadings under Rule 12c.

### B. Existence of a material issue of fact precludes the grant of a motion for partial summary judgment.

Again, Plaintiff has no argument with this fundamental proposition, itself citing *Lion Oil Company, Inc. v. Tosco Corporation*, 90 F.3d 268, 270 (8th Cir. 1996), in which the court added that "Under this strict standard, we accept as true all facts pled by the non-moving party and draw all reasonable inferences from the pleadings in his favor." While the rule favored the moving party in that case, it clearly bars relief on Plaintiff's motion in the case at bar.

15

**C. Compliance with DTA Sec. 5 requires a showing that the "sum of money estimated by said acquiring authority to be just compensation" was a *genuine* estimate and made in *good faith*. Where the admitted basis for the estimate was a defective and expired agreement which is at variance with the demonstrated market value of the property, the estimate requirement cannot be sustained.**

The operative language of the DTA requirement under its paragraph #5 calls not just for a dollar figure, and not for an estimate by a third party, but for an estimate by the acquiring authority. In addition, it specifies a subjective standard by requiring that the acquiring authority conclude that such estimated sum "be just compensation".

We need not apply any rule of strict construction of the plain meaning of a statute, and particularly a statute for condemnation of property, to conclude that this provision requires a good faith due diligence determination by the acquiring authority. While this may be a case of first impression, it is submitted that no citation is required for the proposition that where the Condemnation Complaint explicitly specifies the basis on which the estimate was made, and such basis is materially and demonstrably defective, the "estimate" requirement of DTA has not been met.

**D. In addition to Plaintiff's demonstrated noncompliance with the Declaration of Taking Act, 40 U.S.C. § 3114 (DTA), Plaintiff has failed to sustain its burden of proving compliance with the other authorities specifically alleged and relied on in the Complaint to support the condemnation and taking. The question of such compliance raises a material issue of fact that bars Plaintiff's motion.**

Contrary to the repeated assertions of the Plaintiff in its motion that merely citing the legislative authority is enough, the law and the equities require that the Government **act within the parameters of and in accordance with** proper statutory authority cited and relied on by Plaintiff. Indeed, Schedule "A" of the Condemnation Complaint ("Authority for the Taking")

16