not only recites the six (6) statutes on which it is relying, but specifically states that the "authority for the taking of the lands is under **and in accordance with**...[the cited statutes]".

It is the "**in accordance with**" part of the allegation in the Condemnation Complaint with which Defendants Trust and Tsai take exception and which forms the basis of their jurisdictional objection to the proceeding.

Plaintiff and Defendant YMCA argue that the Government's noncompliance with applicable laws under which the Government was given the authority to condemn the property, is not a defense to a condemnation proceeding, citing cases such as *Berman v. Parker*, 348 U.S. 26, 75 S. Ct. 98 (1954). As discussed below (under heading "E"), the facts presented in *Berman* are readily distinguished from those at bar, but the decision is nonetheless helpful to Defendants Trust and Tsai *on this very point* in that the Supreme Court made it absolutely clear that Congress alone has the authority to dictate how projects funded by it will be executed. To accept the part of the statute that authorizes the taking, but not the part which prescribes the means of accomplishing the public purposes for which the statute was enacted, is hardly a meritorious argument. Yet this is the thrust of most of Plaintiff's legal arguments and cited cases.

In *Berman*, the Supreme Court stresses that "once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine... **the means of executing the project are for Congress and Congress alone to determine**, once the public purpose has been established." *Berman v. Parker*, 348 U.S. 33, 75 S. Ct. 103. (emphasis ours)

Each of the laws that give the Secretary the authority to condemn and 'take immediate possession of' property by eminent domain, including the authorities cited in Plaintiff's Complaint in Schedule A, also dictate the "means by which" the public purpose will be attained and the "means for executing" the project.

17

Cases Cited by Plaintiff and Defendant YMCA on compliance issue

Defendants Trust and Tsai wish merely to observe a fact better known to the courts of the nation than the litigants who appear before them – just based on the broader experience/exposure – that there is a case, and usually several, of high authority, on every subject, supporting and/or opposing every possible proposition and issue. There is a good reason for it: courts are as diverse in opinion as the litigants and issues that appear before them. Occasionally, if the issue (such as the compliance issue here) arises often enough, the higher court will tackle it -- oftentimes for the sole purpose of discouraging litigants from further burdening the crowded courts with it.

Suffice to say that, at least here and now and on the issue of compliance, it will not escape this learned Court that Plaintiff is using a little judo in arguing, on the one hand, that the legislature, not the judiciary, has the supreme authority to make decisions regarding what is in the public welfare – what social purposes justify the sovereign power of eminent domain – and, on the other, to argue (in the face of cases such as *Berman v. Parker*[3] which it cites for different reasons) that once the power of eminent domain has been exercised, everything *else* the legislature has to say about the rules of the road (i.e., the **means** of executing authorized projects), goes by the wayside (e.g. NEPA, EPA, 342 FW 6, DCA, and all the other laws, policies, procedures and regulations with which Plaintiff did not comply). The equities, in light of the facts of the case at bar, are more compelling.

Addressing the "means by which" the within Condemnation was "executed"

In the rush to convert a purported Bargain Sale Option Agreement (and the purported Agreement to Purchase Lands which the Option Agreement spawned), into a "friendly condemnation" at the YMCA's request (so as to defeat Plaintiffs Trust and Tsai's challenges [in the State Court action] to the YMCA's title or right to sell Calf Island), the normal process to

---

[3] 348 U.S. 26, 74 S. Ct. 98 (1954)

18

support an adversarial condemnation went by the boards (and calling it "friendly" doesn't make it so).

It apparently started with a 4/30/02 conversation between Mr. John Eikrem, the President and CEO of the YMCA, and Mr. Anthony R. Conte, Regional Solicitor for the Department of Interior; then there was the call from Attorney Bartels to John Hughes, Chief of the Civil Division, United States Attorney's Office in New Haven. This much can be gleaned from Attorney Bartels' June 13, 2002 letter to Mr. Conte, annexed hereto as <u>Exhibit 7</u>. The letter from Bartels to Conte "respectfully requests that the United States commence a 'friendly' condemnation proceeding pursuant to 28 U.S.C. § 1358…against my client in order to acquire the fee simple of Calves Island".

First of all, 28 U.S.C. § 1358 applies to condemnation proceedings to, *inter alia*, determine the legal owner/clear title in what is otherwise a fully consensual and therefore "friendly condemnation". But use of that method is inappropriate and unavailable in the instant case, where there was a pending title dispute which had been initiated a year *before* the condemnation proceeding. Mr. Bartels 6/13/02 letter to Mr. Conte goes on to state:

> "the relief that my clients request to be entered herein, in addition to fee simple acquisition by the United States, would include a valuation of the island at $6M, which is the same as the purchase price for the Island in the 9/26/00 Agreement for the Purchase of Lands between the United States (acting by and through the Department of Interior) and my client's allied organization, the Trust for Public Land (Inc.) ("TPL")…my client requests that the §1358 Proceeding be commenced as expeditiously as possible in order that my client can then hopefully be able to significantly decrease using its limited charitable assets for its ongoing legal fees and related expenses defending against the lawsuit that was initiated against my client (and also against TPL) via a 2/13/02 Complaint."

It is submitted that the above admissions as to exactly <u>how and why</u> this particular condemnation proceeding was initiated do not <u>derive</u> from any Congressional authority or intent,

19

nor is it "rationally related to a conceivable public purpose", as enunciated in the case cited by the Government (*Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 241, 104 S.Ct. 2321, 2329-30 [1984]); **quite the contrary, the wholly <u>private purpose</u> of this *unfriendly* condemnation is fully spelled out by the architect of this attempted power play in his 6/13/02 letter to the Regional Solicitor.** It is respectfully submitted that when Mr. Conte got the call from Mr. Eikrem, and when Mr. Hughes got the call from Mr. Bartels, both of them representatives of the United States Government and the servants of the public interest, they ought to have declined to participate in, or work to facilitate, let alone expedite, the <u>wholly private purposes</u>, at the public expense, of Mr. Bartels and his client, and its "allied organization", TPL.

Condemnation proceedings and Declarations of Taking are considered extraordinary remedies, not normally undertaken lightly, or as favors, or at the behest of, the 'old boy' network at work here. The Government's argument that it can cite a law as the basis for its authority for its condemnation proceeding, but then <u>not be held to compliance with the mandated policies, practices and procedures</u> enunciated in those laws, is quite obviously without any merit whatsoever.

In Defendant YMCA's October 17, 2002 "Supplemental Memorandum of Law", at p.5, Mr. Bartels provides the Court with "The status of the Condemnation Proceeding" in which he again concedes that the entire proceeding was <u>at the request of the YMCA</u>, and unabashedly describes the preparation of the instant Fish & Wildlife Service "Condemnation Package" as consisting "primarily of completing certain fill-in-the-blanks standard forms". (A copy of the page containing the referenced status report is annexed hereto as <u>Exhibit 8</u>.)

In light of everything we know about how this condemnation proceeding came to be, and how, for example, the issue of 'just compensation' was addressed (to ratchet-up the purported

20

value of the island from "no takers at any price" to $6,000,000 at the expense of the American taxpayers), it is not surprising to see Defendant YMCA describing the F&W Condemnation Package as a "fill-in-the-blanks standard form". But we respectfully submit that the authors of the 342 FW 6, Condemnation, would not so describe it, nor would the Secretary of Interior permit such a cavalier view of the agency's policies and procedures[4]. Particular reference is made to Chapter 6 of the DM, relating to the Office of the Assistant Secretary for Fish and Wildlife and Parks whose responsibilities include "execution of all laws and Executive Orders imposing obligations on the Secretary with respect to assigned programs"; and to Chapter 3 of the DM, relating to the Office of the Solicitor and its responsibility to see that all programs and activities "are managed in a manner consistent with applicable law"[5]. More to the point, the F&W Condemnation Package, the requirements of which are so cavalierly dismissed by both Defendant YMCA and the Government in its within motion, specifically require that it is not enough to cite the legislative authority, but rather, shall require confirmation that there has been compliance with, for example, the National Environmental Policy Act (NEPA), and the Real Property Acquisition Policies Act of 1970, as amended.(342 FW §6.10[A][1] and [3]).

---

[4] (see, for example, the Departmental Manual [DM] of the Department of Interior which can be downloaded at http://elips.doi.gov/elips/release/3384.htm)

[5] The Solicitor's Manual can be downloaded at http://www.doi.gov/sol/solman.html.

**E. Plaintiff argues that the only question for judicial review in a condemnation proceeding is whether the purpose for which property was taken is for a Congressionally authorized public use.**

To support the proposition, Plaintiff cites *United States v. 416.81 Acres of Land*, 514 F. 2d 627, 631-32 (7th Cir.)[6], which, in turn, cites *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98 (1954).

All cases are decided on a given set of underlying facts, not in a vacuum. Taking statements out of the context in which they were made, and attempting to apply them universally to a completely different fact pattern, does not create good law. There are many condemnation cases, for example, where questions, <u>*other than*</u> "whether the purpose for which property was taken is for a Congressionally authorized public use" are intelligently and rationally addressed, based on the facts presented.

In *Berman v. Parker*, the statutory authority was the District of Columbia Redevelopment Act of 1945, in which Congress had made a legislative determination regarding the need to redevelop "the seat of the Government" and further determined that said goal "cannot be accomplished unless it be done in the light of comprehensive and coordinated planning of the whole territory of the District of Columbia and its environs". 348 U.S. at 29, 75 S.Ct. at 101. The Court noted that the "power of Congress over the District of Columbia includes all the legislative powers which a state may exercise over its affairs.(citations omitted)" 348 U.S. at 31, 75 S.Ct. at 102.

> "We deal, in other words, with what has been known as police power...The definition is essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition. Subject to specific constitutional limitations, when the

---

[6] One point which the court makes in *United States v. 416.81 Acres of Land* which <u>is</u> applicable to the facts presented here is that a motion to strike a defendant's objections and defenses cannot be granted if any substantial questions of law or fact exist.514 F.2d 631.

22