UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

UNITED STATES OF AMERICA,  :
    Plaintiff,  :

2005 DEC 27 A 9: 19

    v.  :    CASE NO. 3:02-CV-00462 (AHN)

U.S. DISTRICT COURT

28.8 ACRES OF LAND, ET AL.,  :

    Defendants.  :    DECEMBER 23, 2005

### AFFIDAVIT OF SUSANNE P. WAHBA

County of Fairfield  )
                     ) ss: Stamford
State of Connecticut  )

    I, Susanne P. Wahba, of Greenwich, Connecticut, being duly sworn, do depose and state:

    1.    I am over 18 years of age and understand the meaning of the oath.

    2.    I submit this Affidavit in support of my Motion for Award of Compensation. I have asserted a claim for compensation from plaintiff United States of America in connection with plaintiff's condemnation of Calf Island. The statements I make herein are based on my personal knowledge.

    3.    I am the current owner of shoreline property located at 111 Byram Shore Road, Greenwich, Connecticut ["the property"], originally owned by Rowena Teagle who also owned land on Calf Island. [Chain of title from Rowena Lee Teagle to Susanne P. Wahba is summarized at Exhibit A, and the deeds establishing chain of title are attached as Exhibits A1-A11]. From my property there is a beautiful panoramic view of Long Island Sound and a chain of islands, including Calf Island. [Photographs of views of the Island from the property are attached as Exhibit B]. The northwest side of Calf Island is directly in front of my property at a

distance of approximately 2,000 feet. This view was a material and substantial factor in inducing my husband, Mahmoud A. Wahba, and me to purchase the property.

4. Prior to the purchase, I learned from either George Smith, whose wife owned the property, or my husband, that the YMCA of Greenwich owned Calf Island and that there were protections in place so that no construction of any kind could take place on the side of the Island facing my property (the northwest side of the Island). I relied on this, as did my husband, in valuing the property and deciding to purchase the property. The house we built on the property was specifically designed to capture the view of the islands. The side of the house facing the Island is made of glass, and there is a view of the Island from almost every room in the house.

5. The Deed to the YMCA indicates that in 1955, Rowena Lee Teagle and three other persons (C. Redington Barrett, John D. Barrett, Jr., and Jeremiah Milbank), who together were the owners of Calf Island, gifted the Island by deed to the YMCA with restrictions on use of the Island. [Deed to YMCA attached as Exhibit C]. The deed restrictions prohibiting construction on the northwest side of the Island and restrictions respecting building height on other portions of the Island served to prevent any construction visible from Rowena Teagle's other properties, including property now owned by me.

6. When it became public knowledge that the YMCA was looking for a buyer for the Island, I received many phone calls and mailings from different groups with varying ideas about what should be done with the Island. One of the persons that contacted me was Marilyn Hess, a former neighbor. I did not know when I first spoke to Ms. Hess that she was a member of the YMCA's Board of Directors, and she never introduced herself as a board member. I learned about her connection to the YMCA later from a third party, and I believe I was aware of her relationship to the YMCA by the time I signed a document, entitled "Agreement", in October

2001.

7. Ms. Hess called me on several occasions to discuss preserving the Island as a wildlife conservancy. She was concerned about construction on the Island should it be sold to a private party, and stated repeatedly that numerous homes could be built on the Island. During one of these phone calls she asked me whether I and my husband would sign a document which would further the goal of preserving the Island as a wildlife habitat. I agreed to take a look at the document. Fearful that the Island could be sold to a private developer and that the Island would be turned into a residential property, as Ms. Hess had indicated, I signed the document entitled "Agreement" on October 2, 2001. [Document attached as Exhibit D].

8. On November 1, 2001, Ms. Hess and Bruce Reynolds, a representative of what I believed to be a charitable organization (and who I now understand was a representative of the Trust for Public Land), came to my home to retrieve the document. I did not fully understand what function Mr. Reynolds' organization served, but believed that it was working with the YMCA toward preserving land for the public. I now understand that the Trust for Public Lands was paid a large commission for brokering a deal between the YMCA and the United States, but that fact was not disclosed to me at the time.

9. When they arrived at my home, I took Ms. Hess and Mr. Reynolds outside to show them the view of the Sound and the Island from the shoreline. They were aware that it was of paramount importance to me to preserve this view.

10. It was my understanding at the time that with this document, the YMCA would be better able to sell the Island for use as a wildlife conservancy. At no time did I understand that by signing the document, I was giving up any of my rights with respect to the building restrictions on the Island.

11. No one told me that by signing the document I was releasing the covenants or waiving any rights or interests that I had in the covenants, other than that the Island could be used as a wildlife conservancy. Indeed, I believed that we were in fact furthering the goals of the original Grantors that the Island remain pristine and without buildings on it.

12. I was never told, nor did I suspect, that the federal government was contemplating condemning the Island, or that, should it do so, I would lose all rights and interests we had in the covenants, and in the protection of the sight line we wished to preserve. I certainly had no intention of giving up any rights I had without compensation.

13. Neither I nor my husband were authorized by any of the other property holders who benefitted from the covenants to release or waive any of the covenants, and I had no intention of doing so.

14. Neither I nor my husband received any remuneration in exchange for signing the document. Whatever benefit we may have derived from signing it was undercut by the YMCA and the Trust for Public Lands' negotiation of a deal with the federal government which extinguished any rights we had to control what was done to the Island.

15. I believe that my property with its current view protected has a value in excess of $9,000,000. I believe that a significant component of the value of my property derives from its magnificent view and that a potential purchaser would be unwilling to pay such a large amount for the property without its protection and knowing that the view is subject to substantial impairment in the future. The protection of the view created by the Grantors' original deed restrictions on use of the Island, thus, were a significant aspect of the overall value of the

property. I believe that the condemnation of the Island by the plaintiff, with the resultant loss of the deed restrictions on the Island, has resulted in a depreciation in the value of my property.

*Susanne P. Wahba*
SUSANNE P. WAHBA

Subscribed and sworn before me this 23rd day of December, 2005.

*Elizabeth A. Reis*
NOTARY PUBLIC

ELIZABETH A. REIS
A NOTARY PUBLIC OF CONNECTICUT
MY COMMISSION EXPIRES MARCH 31, 2010

## **CERTIFICATION**

This is to certify that a copy of the foregoing is being mailed, postage prepaid, this 23rd day of December, 2005 to:

Philip H. Bartels, Esq.
John C. Fusco, Esq.
Shipman & Goodwin
289 Greenwich Avenue
Greenwich, CT 06830

John B. Hughes, Esq.
U.S. Attorney's Office
157 Church Street, 23rd Floor
P.O. Box 1824
New Haven, CT 06510

John V. A. Murray, Esq.
Diserio, Martin, O'Connor & Castiglioni
One Atlantic Street, Suite 500
Stamford, CT 06901

Mary Sommer, Esq.
Sandak Hennessey & Greco
707 Summer Street
Stamford, CT 06901-1026

_____
MARILYN J. RAMOS ct11433